**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

_____

**UNITED STATES OF AMERICA,**

                                        **Plaintiff,**                    **06-CR-271S(Sr)**

**v.**

**WARREN T. SMITH, Jr.,**

                                        **Defendant.**

_____


## REPORT, RECOMMENDATION AND ORDER

        This case was referred to the undersigned by the Hon. Richard J. Arcara,

in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report

upon dispositive motions.  Dkt. #10.


## PRELIMINARY STATEMENT

        The defendant, Warren T. Smith, Jr., is charged in an indictment with

violation of 18 U.S.C. § 922(g)(1) and 21 U.S.C. § 844(a).  Dkt. #1.  By Notice of Motion

filed October 2, 2006, defendant moved to suppress two firearms, _to wit_, a Colt model

Anaconda .44 magnum caliber revolver bearing serial number AN07053 and a Smith &

Wesson model Military & Police .38 special caliber revolver bearing serial number

595534, and marijuana found on his person, as well as certain statements made with

respect to these items, on the ground that he was arrested without probable cause.

Dkt. #7.

The government filed a response in opposition to defendant's motion on November 3, 2006.  Dkt. #9.  An evidentiary hearing was conducted on January 10, 2007 and a transcript of the proceedings was prepared and filed therafter.  Dkt. #13. Memoranda of law were filed on May 10-11, 2007 (Dkt. ##18-19), at which time the motion to suppress was taken under advisement.

## FACTS[1]

City of Buffalo Police Officer David Lettere responded to a call of gunshots fired and a victim shot at 379 William Street at approximately 11:42 p.m. on June 3, 2006.  (T. 7, 25).  During the course of the investigation of that shooting, officers determined that the suspects were three black males, one wearing a black hoodie and two wearing gray hoodies, driving a dark gray or black four-door Dodge Intrepid.  (T. 10-12, 15, 27).

On June 4, 2006, at approximately 5:37 p.m., Officer Lettere was parked in his patrol car on a side street one block north of Peckham Street near Mortimer Street when he observed a dark-colored four-door vehicle with dark tinted windows traveling north on Mortimer Street at a very slow rate of speed, "slower than 30 miles an hour."  (T. 5-6).  Officer Lettere testified that the vehicle

> came up to the stop sign at Mortimer and Peckham, when it
> was halfway through the intersection, after it failed to stop

---

[1] The facts are taken from the transcript of the evidentiary hearing conducted on January 10, 2007 (Dkt. #13), and references to same are designated as "T" followed by the appropriate page number or numbers.

> for the stop sign, it made a[n] evasive right hand, which
> would be east on Peckham, like a[n] evasive move, like it
> had seen my patrol car and didn't want to go past my patrol
> car at that time.

(T. 6-7).  More specifically, Officer Letter stated that:

> In my opinion it appeared the vehicle was looking for
> something.  It was driving that [sic] slow that it could have
> stopped at any time, and . . . because it was traveling north
> in a really slow, I mean a walking pace, and when it
> observed me it made that erratic right-hand turn to get to
> Jefferson, that's what drew my attention to this vehicle.

(T. 41).  Officer Lettere testified that he considered the vehicle as possibly having been

involved in the shooting the night before based upon the description he recalled of that

vehicle and the proximity of the vehicle to the location of the shooting. (T. 7, 8, 17).

Officer Lettere described the location as being approximately three-quarters of a mile[2]

from the location of the shooting the night before.  (T. 6, 16).


        Although he was initially unable to determine how many people were

inside the vehicle because of the tinted windows, he testified that because it was a

bright day, he was able to observe at least three occupants in the vehicle consisting of

the driver, a passenger in the front seat and a passenger in the rear seat behind the

front seat passenger once he began to follow the vehicle northbound on Jefferson.  (T.

8-9).  There was one vehicle between Officer Lettere and the vehicle he was following.

(T. 9).

---

[2] The Court takes judicial notice of the fact that the distance between 379 William Street and 683 Jefferson Avenue is .74 miles.  *See*  www.mapquest.com.

Officer Lettere observed that the rear passenger was wearing a hat and testified that the brim of the hat was moving left to right as if the wearer were trying to see if there was a police officer behind him.  (T. 17).  He also observed the front seat passenger leaning "forward as in a motion to maybe place something underneath the seat" or "pick something off the floor."[3]  (T. 17-18).

Officer Lettere determined that the vehicle was a black, four-door Chevy Lumina and dispatched the license plate number over his radio.  (T. 30-31, 49).  He decided to stop the vehicle "[b]ecause of the events the night before of a shooting in the area."  (T. 18).  Although Officer Lettere had observed the vehicle drive through the stop sign and execute a right hand turn without signaling, he denied stopping the vehicle because of these violations.  (T. 47-48).  Specifically, Officer Lettere testified as follows:

> Q    Did you stop the car because of the vehicle
>       and traffic violation you observed or because
>       you thought it was involved in the shooting the
>       night before?
>
> A    Because of the shooting involved the night before.
>
> Q    You just happened to have also observed a
>       vehicle and traffic violation.
>
> A    A couple of them, yes, sir.

(T. 48).  It is pointed out that in response to this Court's question, counsel for the government expressly stated that the government was not relying on a Vehicle & Traffic Violation to justify the stop in question.  (T. 64).

---

[3] After the vehicle was stopped, officers observed food from a fast-food restaurant on the floor of the front seat.  (T. 41).

Officer Lettere broadcast his intention to stop the vehicle over the radio and waited for backup, at which time the responding police officers conducted a "felony stop" of the vehicle at Jefferson and Genesee.  (T. 19, 34).  Officer Lettere explained that

> I had three occupants in the vehicle, and at that time I had suspicion of these men in the vehicle possibly with weapons. Okay.  And what we do is we try to outnumber the occupants.  I clearly stated in my transmission I had three occupants of this vehicle, so what we do is we try to have more manpower than the occupants of the vehicle.  Once we forcefully stop the vehicle by cutting it off or making it stop in the middle of the street . . . it's a[n] element of surprise; you just all of a sudden have the police cars surround it and stop it – we then approach the vehicle, usually with our guns drawn, and then we have other officers take them out of the vehicle for safety reasons.

(T. 19-20).  Officer Lettere testified that he approached the vehicle with his gun drawn. (T. 20).

City of Buffalo Police Officer Robert Chappell testified that he was on patrol in the area at approximately 5:30 p.m. on June 4, 2006 when he heard Officer Lettere broadcast "that he was following a vehicle that he believed was used in a shooting the prior evening."  (T. 50-51).  Officer Chappell was the third car on the scene.  (T. 50-51).  He and the other officers used their patrol cars to surround the vehicle and approached the vehicle with their weapons drawn.  (T. 52).  Officer Chappell opened the rear door and confronted the defendant at gunpoint.  (T. 53).  He instructed him to put his hands where Officer Chappell could see them and asked him to step out of the vehicle.  (T. 53-54).  Officer Chappell then "reached in and grabbed

him by the shirt and assisted him out of the vehicle." (T. 54). Officer Chappell

holstered his weapon as he was helping the defendant out of the car and "immediately

felt [the defendant's] waistband, and . . . felt a bulge" which felt like a weapon. (T. 54).

Officer Chappell instructed the defendant to place his hands on the vehicle and then

retrieved a .44 caliber Colt Anaconda from the defendant's waistband. (T. 55). Officer

Chappell then put the defendant on the ground, handcuffed him, and continued his

search of the defendant whereupon he discovered the second weapon, a .38 Special

Smith & Wesson, in the defendant's right front pocket. (T. 55-56). Another police

officer subsequently discovered some marijuana in his right front pants pocket. (T. 56).

The defendant was then formally placed under arrest and charged with illegal

possession of the weapons and marijuana.


## DISCUSSION AND ANALYSIS

The defendant argues that the circumstances of his seizure amount to an

arrest without probable cause. Dkt. #18, p.7. Alternatively, the defendant argues that

the police officers lacked reasonable suspicion to stop the vehicle and seize him. Dkt.

#18, p.10. The defendant notes that the vehicle was stopped more than 18 hours after

the shooting and that the vehicle stopped was a Chevy Lumina, while witnesses to the

shooting described a Dodge Intrepid as the vehicle involved in the shooting. Dkt. #18,

pp.12-18.


The government argues that the "felony stop" was reasonable and

amounted to an investigatory stop, not an arrest. Dkt. #19, p.6. Given the resemblance

of the vehicle to that described by witnesses to the shooting; the fact that the same

number of individuals were observed within the vehicle as were observed in the vehicle

departing the scene of the shooting; and the observations of the vehicle's speed and

evasive maneuvers, as well as the occupant's furtive gestures; the government argues

that the decision to conduct a "felony stop" was reasonable, and, in fact, necessary to

ensure police officer safety.  Dkt. #19, pp.4-8.

> In general, the Fourth Amendment dictates that an arrest, to be lawful, must be predicated on probable cause. Probable cause exists when a person of reasonable caution would be justified in believing that the individual to be arrested has committed, is committing, or is about to commit a crime.  In addition, probable cause is necessary when police restrain an individual in a manner that, though not technically an arrest, is nonetheless so intrusive as to be tantamount to an arrest.  When, however, police restrain an individual in a manner that falls short of arrest or its functional equivalent, less than probable cause will suffice. In such a situation, the Fourth Amendment imposes the more flexible requirement that the stop be, in all the circumstances, reasonable, and that it be based on a reasonable and articulable suspicion.  The reasonableness of a particular stop depends in turn on the extent of the intrusion on the rights of the individual, and on the reason for the restraint.
>
> In determining whether a particular restraint is an arrest or tantamount to an arrest, thus requiring probable cause, or instead is restraint short of an arrest, thus calling for analysis under a reasonableness standard, the degree of restraint must be analyzed.  When no formal arrest has been made, several factors must be considered.  In particular, courts have considered the amount of force used by the police, the extent of the intrusion, and the extent to which the individual's freedom of movement is restrained.  In cases involving stops of cars, we have considered the number of police officers and cars used to effect the stop; whether the police blocked the car in motion or otherwise

> completely impeded its movement, or whether they merely
> pulled up near it; and whether the police officers had their
> guns drawn and in view.

*United States v. Marin*, 669 F.2d 73, 81 (2d Cir. 1982) (internal quotations and citations

omitted).  In that case, law enforcement stopped the car in which Marin was a

passenger after the car made a U-turn on a dead-end street

> by means of three or four DEA cars blocking its forward
> progress, and one DEA car directly behind.  There was
> evidence that the agents rapidly surrounded the Cadillac
> with their guns drawn, and that at least two of the occupants
> of the car were physically removed from the car by the
> agents.  Marin, as he was being frisked, tried to walk away
> and was physically restrained by [the DEA agent].

*Id.*  The Court of Appeals "had little difficulty in concluding" that the initial stop of the car

under these circumstances "was tantamount to an arrest."  *Id.*  However, the Court of

Appeals found that the DEA agents had "compelling grounds," based upon extensive

surveillance, to believe that Marin was engaged in narcotics trafficking when they

stopped the vehicle.  *Id.* at 82.


Subsequently, the Court of Appeals considered a case in which "at least

four, and as many as six, vehicles used their flashing lights and sirens to stop the cab"

in which a suspected money launderer under surveillance by law enforcement officers

was riding as a passenger.  *United States v. Perea*, 986 F.2d 633, 637 (2d Cir. 1993).

"Government cars then blocked the cab in front and back and on one side, and the

agents approached the cab, some with guns drawn."  *Id.*  The Court of Appeals

determined that "the initial stop of the livery cab was not an arrest but rather was a

*Terry* stop that was lawful because the agents, given their surveillance observations,

had a reasonable suspicion of criminal activity." *Id.* at 644.  This Court notes that as

part of their surveillance, law enforcement officers observed that immediately before he

entered the cab, Perea "had his left hand in his pocket, leading a surveilling agent to

suspect that he had a weapon in the pocket." *Id.* at 636.  The Court of Appeals noted:

> The fact that agents have used their cars to block a vehicle
> does not necessarily mean that, instead of a *Terry* stop,
> there was a *de facto* arrest.  Nor does the fact that the
> officers approached a stopped car with guns drawn in order
> to protect themselves and bystanders on the street
> necessarily transmute a *Terry* stop into an arrest.

*Id.* at 644.  However, the Court of Appeals remanded the case to the district court for

resolution of factual issues as to what transpired after the stop, *to wit*, whether Perea

was dragged from the cab, immediately frisked, handcuffed and thrown to the ground,

or whether Perea exited the cab voluntarily, denied ownership of the duffel bag in the

trunk and was handcuffed only after agents searched the bag.  *Id.* at 645.  The Court of

Appeals found resolution of these questions necessary because "an encounter that

began as a permissible *Terry* stop may have ripened into an arrest, which must be

supported by probable cause, if, for example, the officers unreasonably used means of

detention that were more intrusive than necessary."  *Id.* at 644.


            Thereafter, the Court of Appeals emphasized that although no single

factor, standing alone, necessarily converts a detention from a *Terry* stop into a *de

facto* arrest, detentions involving "numerous intrusive elements, with little or no

reasonable justification," will not be condoned as a *Terry* stop.  *Oliveira v. Mayer*, 23

F.3d 642, 646  (2d Cir. 1994), *cert. denied*, 513 U.S. 1076 (1995).  The Court of

Appeals also noted that whenever it "found an intrusive detention to be only a *Terry* stop, the police have always had a reasonable basis to believe the suspect was armed or otherwise dangerous." *Id.* As a result, in *United States v. Green*, the Hon. David G. Larimer adopted Magistrate Judge Feldman's determination that a detention was a *Terry* stop rather than an arrest even though "there were several officers and police vehicles present . . . the officers had their guns drawn, and [the defendant] was immediately restrained upon exiting the vehicle" because

> the officer had been given a detailed description, by a known informant, of a man carrying a firearm; Green matched the informant's description of the gun-wielding man; and the informant confirmed his initial description by driving to the scene, where the suspect entered the vehicle. Under those circumstances, it was more than reasonable for the officers to order the occupants out of the car and to restrain them, particularly Green, for their own safety and that of any others in the area.

381 F. Supp.2d 125, 127 (W.D.N.Y. 2005).

In the instant case, the intrusive elements are numerous. Officer Lettere testified that he intended to conduct a "felony stop" and requested sufficient backup to outnumber the occupants of the vehicle. (T. 20). Officers forcefully stopped the vehicle by surrounding it and blocking it in the middle of the street. (T. 52). At least three officers approached the vehicle with their weapons drawn while additional officers removed the occupants of the vehicle. (T. 20, 52, 58). Officer Chappell testified that he confronted the defendant at gunpoint and that he reached into the vehicle, "grabbed him by the shirt and assisted him out of the vehicle." (T. 53-54).

The factual circumstances of the stop in the instant case are nearly identical to those set forth in *United States v. Campbell*, 959 F. Supp. 606 (W.D.N.Y. 1997), *aff'd*, 152 F.3d 921 (2d Cir. 1998).  In that case, the Hon. Richard J. Arcara adopted the Report and Recommendation of Magistrate Judge Heckman finding that the following encounter between a defendant and law enforcement officers constituted a *de facto* arrest:

> as soon as defendant pulled his vehicle over to the curb on Genesee Street, he was "boxed in" by police vehicles, street traffic and parked cars.  Investigator Johnson approached defendant's vehicle with his weapon drawn.  As he did so, at least two other officers had their weapons drawn and pointed at the defendant.  There were at least six vehicles containing thirteen law enforcement officers in the immediate vicinity of the stop.  When defendant failed to comply with Johnson's directions to exit the vehicle with his hands up, Johnson forcibly removed defendant from his vehicle and placed him face down on the pavement.

*Id.* at 612 (internal citations to record omitted).  However, Campbell's girlfriend had provided detailed information to law enforcement officers about her boyfriend's drug dealing and possession of firearms, including a handgun that he carried with him at all times, and law enforcement officers were able to corroborate significant details of the girlfriend's allegations before they stopped Campbell's vehicle.  *Id.* at 608-10.   As a result, the Court found probable cause for the stop of the vehicle and seizure of the defendant.  *Id.* at 612-13.[4]

---

[4] In an unpublished opinion, the Court of Appeals agreed "that the seizure of the defendant when he pulled his car over to the curb was a "de facto" arrest rather than a *Terry* investigative stop" and explicitly rejected "the government's argument that the fact that the DEA officers had been alerted to the possibility that the defendant was armed and dangerous is sufficient to turn this very intrusive seizure into a *Terry* stop."  *United States v. Campbell*, 1998 WL 432958, at *1 (2d Cir. 1998).

In the instant case, in contrast, the justification for such a show of force is minimal.  Although Officer Lettere suspected that the vehicle was involved in the shooting on William Street the night before, that suspicion was based on nothing more than the fact that the vehicle was a dark colored four-door sedan with three occupants which was driving at a very slow rate of speed and appeared to avoid driving past Officer Lettere's patrol car and the fact that one of the occupants appeared to be looking to see if the patrol car was following the vehicle, while another appeared to be bending down to the floor of the vehicle.  (T. 6-7, 17-18).  Officer Lettere was aware that the vehicle involved in the shooting had been described as a Dodge Intrepid, while the vehicle he was following was a Chevy Lumina.  (T. 15, 30-31, 49).  Moreover, there was no evidence that the vehicle involved in the shooting had dark tinted windows.  In addition, the vehicle was three-quarters of a mile away from the scene of the shooting and eighteen hours had elapsed.  This material discrepancy in the vehicle's description, combined with the vehicle's temporal and geographic distance from the shooting, taken in their totality cause this Court to conclude that there was no legal basis upon which to justify a *Terry* stop, let alone an arrest of the defendant.

## CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that defendant's motion (Dkt. #7), to suppress the weapons and marijuana found on his person be **GRANTED** and that the defendant's statements with respect to this evidence be suppressed as fruit of the poisonous tree.  In light of this recommendation, the Court finds it unnecessary to resolve defendant's discovery demands.

_____Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

_____This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to**

comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2

(concerning objections to a Magistrate Judge's Report, Recommendation and

Order), may result in the District Judge's refusal to consider the objection.


/s/ H. Kenneth Schroeder, Jr.

_____
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**


**DATED:**       **Buffalo, New York**
              **October 29, 2007**